716 A.2d 1171 (1998)
315 N.J. Super. 91
In the Matter of the ADOPTION OF A CHILD by P.S. and J.S., H/W.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 1998.
Decided July 21, 1998.
*1172 Toby Solomon, Livingston, for appellant.
Gerald R. Salerno, Hackensack, for respondent (Aronsohn and Weiner attorneys; Mr. Salerno on the brief).
Johnson, Murphy, Hubner, McKeon, Wubbenhorst & Appelt, Riverdale, for amicus curiae St. Joseph's Hospital and Medical Center (William F. Johnson, Jr., on the brief).
Cecilia M. Zalkind, Newark, for amicus curiae Association for Children of New Jersey.
Before Judges DREIER, PAUL G. LEVY and WECKER.
The opinion of the court was delivered by WECKER, J.A.D.
This case turns on an issue last addressed by our Supreme Court In re Guardianship of J.C., 129 N.J. 1, 608 A.2d 1312 (1992), and its companion case, In re Guardianship of K.L.F., 129 N.J. 32, 608 A.2d 1327 (1992), as well as by this court in In re Guardianship of J.T., 269 N.J.Super. 172, 634 A.2d 1361 (App.Div.1993). That issue is whether A.R., an almost nine-year-old[1] girl with neurological deficits, developmental delays, and learning disorders, having bonded with her foster parents of seven years who seek her adoption, is likely to suffer serious and substantial harm if she is removed from their custody and returned to her biological mother, harm sufficient to warrant the termination of that mother's parental rights. The issue arises in the context of a proposed private adoption. The foster and proposed adoptive mother, J.S., is a cousin of the biological mother, M.R. M.R. voluntarily placed A.R. with J.S. and her husband, P.S., when M.R. realized that she could not care for A.R. or her older brother, C.B.,[2] and needed in-patient rehabilitation from her long-term addiction to alcohol and other substances.
After several days of testimony on the termination of parental rights issue, the trial judge expressed frankly and with sensitivity his concerns about the long history of the court's involvement with this child; his recognition of her complete bonding with J.S. and P.S. and their three older children; her remarkable progress under their care and nurturing and in the face of her serious deficits; as well as M.R.'s record of rehabilitation as an alcoholic. After concluding that M.R. had not abandoned A.R. in the sense of "a willful or purposeful refutation of parental responsibility," and that therefore "the evidence here falls short of establishing, by clear and convincing evidence, that the parental rights of [M.R.] should be terminated," the judge nevertheless followed the guidance of J.T., 269 N.J.Super. at 191, 634 A.2d 1361, and determined that reunification with the biological parent "should not automatically follow dismissal of the termination complaint because `the potential harm to [the child] if she is separated from her foster mother' could not be ignored." He dismissed the foster parents' complaint for adoption and ordered D.Y.F.S. to develop a plan for reunification, but denied M.R.'s application for unsupervised and increased visitation.
While we commend the judge for his sensitivity and concern for all of the parties, we conclude that his interpretation of the standards governing this termination case was unnecessarily restrictive. In particular, we conclude that J.C. not only permits but requires a determination "whether [A.R. has] bonded with [her] foster parents and if so whether breaking such bonds would cause [A.R.] serious psychological or emotional harm." J.C., supra, 129 N.J. at 25, 608 A.2d 1312 (emphasis added). We therefore reverse the judgment dismissing the adoption complaint and denying the application to terminate M.R.'s parental rights, and remand for a bonding evaluation, in accordance with J.C., focusing on the likely harm to A.R. if she is separated from J.S. and P.S., and M.R.'s likely ability to counter such harm.
A.R. was born on April 24, 1988, to defendant M.R. and D.B.[3] M.R. and D.B. had an *1173 older child, a boy, C.B. born in December 1984. They never married, and their relationship, marked by incidents of domestic violence, ended before A.R. was born.
On August 4, 1989, M.R. voluntary placed both fifteen-month-old A.R. and four-and-one-half-year-old C.B. with the Division of Youth and Family Services (DYFS) in Union County, where M.R. resided. A.R. was first placed with an unrelated foster family. However, seventeen days later, on August 21, A.R. was transferred to M.R.'s first cousin, J.S., and her husband, P.S. M.R. requested that A.R. be placed with her cousin, preferring that A.R. be with a family member rather than with strangers. The voluntary transfer was precipitated by the fact that M.R. had been abusing drugs and alcohol for some time, was often drunk, and admittedly had been neglecting both children. M.R.'s inconsistent drug and alcohol rehabilitation efforts had not been successful up to that point. There is no dispute that at the time A.R. was placed with J.S. and P.S., she had significant neurological deficits, was developmentally delayed, and showed many signs of emotional if not physical neglect. She has required special interventions and educational assistance from the earliest age to date, and will likely always have special needs.
C.B. was placed in foster care with a friend and neighbor of M.R., with whom he has remained. M.R. has only supervised visitation with C.B., now a fourteen-year-old boy with more serious disabilities than A.R. We are told that M.R.'s application for custody of C.B. is in abeyance in Union County pending the outcome of this case.
The history of A.R.'s involvement with the judicial system is lengthy. On January 2, 1990, a family court judge in Passaic County[4] (where J.S. and P.S. reside) awarded temporary custody of A.R. to J.S. and P.S., with liberal but supervised visitation for M.R. The trial judge noted that "it was clearly intended that there be family reunification. And at the very least, a hearing with regard to that." On January 25, 1990, another judge ordered that the matter be reviewed in one year. In June 1990, however, two orders were entered with regard to visitation, with the case to be relisted for a hearing in one year. The same custody arrangement and visitation were reconfirmed in a June 1991 order. Still another judge was assigned to the case in October, 1991. He ordered additional reports and evaluations. In June 1992 and again in September of that year, the judge reviewed the case and fixed visitation rights at one-and-one-half hours each week, to take place at J.S. and P.S.'s home and under their supervision. Another judge reviewed the case in October 1992 and ordered that custody continue in accordance "with the placement plan currently in effect."
A review of the case in April 1993 resulted in expansion of visitation to two hours each Thursday evening and four hours on one Saturday afternoon each month, all under the supervision of M.R.'s in-laws. In June, August, and October of 1993, the case was again reviewed. The October order provided that DYFS "is to initiate less restrictions regarding phone contact" between M.R. and A.R. The "goal of reunification" was restated in both the June and August orders.
Subsequent orders in May and July 1994 continued the same terms, with DYFS directed to "consider having [A.R. and C.B.] attend the learning disabilities class with their mother and step-father [given by] Phyllis Taistra [of the] Verona Public Schools." The May order, captioned as most of the orders "Concerning Placement Under the Child Placement Review Act N.J.S.A. 30:4C-50 et seq.," recommends "a summary hearing for a determination and the identification of a permanency plan [ ]" and ordered the case worker for each child to be present.
Throughout the period of the above-described orders, none of which were ever appealed, M.R. regularly maintained contact with the DYFS offices, never abandoning her efforts to regain custody of the child. From the initial placement in 1989 to the end of 1994, DYFS shared this goal of reunification, at least on paper. However, although DYFS *1174 was required to take steps to accomplish this, including getting M.R. into a program for controlling her substance abuse, M.R. contends that the agency did little if anything to accomplish this goal. Nevertheless, M.R. provided DYFS with evidence of attendance at outpatient follow-up to her 28-day rehabilitation, negative urine screens throughout 1992, and attendance at AA/NA meetings throughout that year. There is no evidence that M.R. has taken up drinking or other substance abuse since.
With one exception, M.R. was apparently unrepresented at the custody reviews. Also with one exception, either M.R. or her husband appeared at each review. Nevertheless, she was never able to persuade the court to increase her visitation significantly, or to make it unsupervised. The following exchange at trial is noteworthy:
[PLAINTIFF'S COUNSEL:] Q. [M.R.], you've been in Court, numerous times, in Passaic County trying to regain custody of your child, is that correct?
[DEFENDANT:] A. Correct.
Q. And each time, you were not only denied custody, you were denied unsupervised visitation, is that correct?
A. I didn't ask for unsupervised visitation.

Q. You didn't want unsupervised visitation with your daughter?
A. Well, I ask [sic] for visitation. And that's the way Judge Scancarella set it up. And since Imy family is there anyway always, you know, because I think it's nice for the children to be atnot only for her to see her brother, but her cousins. They're there anyway. They would be invited anyway. I didn't fight it. Let's put it that way. I didn't fight it. I wanted weekends, but I didn't getI didn't get that.

[emphasis added.]
J.S. and P.S. filed their adoption complaint on January 5, 1995. At the initial hearing, the family court judge ordered that A.R. was a ward of the court, and granted custody to J.S. and P.S. After defendant filed her objection to the adoption, counsel was appointed for her, and a law guardian was appointed for the child. M.R. filed an answer and counterclaim, objecting to the adoption and demanding that custody of A.R. be returned to her.
The case then was transferred to the judge who tried the case, and who denied M.R.'s motion to dismiss the complaint for lack of standing. He noted that although J.S. and P.S. would not have had standing to initiate an adoption complaint under N.J.S.A. 30:4C-15, dealing with petitions for termination of parental rights initiated by DYFS rather than by a private party, this case involved the voluntary placement of a child with relatives, and J.S. and P.S. therefore had standing to initiate an adoption complaint under Title 9. On this appeal, M.R. does not challenge J.S. and P.S.'s standing to bring the action.
The case was tried over five days between January 13 and January 27, 1997. In an oral opinion on February 28, the trial judge dismissed the adoption complaint, but continued custody with J.S. and P.S., and denied additional visitation, thus denying M.R.'s counterclaim. DYFS was ordered to "develop a plan for reunification" and report back to the court.
This appeal followed. M.R. has not filed a cross-appeal from the denial of custody. The foster parents requested a stay of those provisions of the court's order dealing with the plan of reunification, based on the contention that attempts at reunification would "cause irreparable emotional and psychological harm" to the child. The trial judge denied the request, but we granted a stay pending the outcome of this appeal.
[Details of M.R.'s substance abuse and inability to care for her very young children, preceding her voluntary transfer of custody, have been omitted for purposes of publication.] The following facts appear from the evidence at trial. M.R. eventually requested that DYFS provide assistance so that she could go into a short, inpatient detoxification program at Elizabeth General Hospital. After M.R. completed the program, C.B. was returned to her. However, she was unable to remain sober, and needed a longer in-patient program. In the interim she began a more intensive out-patient program at Union *1175 Hospital, known as Genesis, while she waited for admission to the in-patient rehabilitation program at Runnells Hospital.
On August 4, 1989, after a DYFS caseworker found M.R. unable to care for the children, C.B. was voluntarily placed with a neighbor, and A.R. was placed in foster care. M.R. was advised by the DYFS worker that because she sought help voluntarily, she would get her children back as long as she could remain clean and sober.
While in the Elizabeth General Hospital detox program, M.R. contacted J.S., her first cousin, telling her that A.R. had been placed with another foster family, but that she would be more comfortable if A.R. could stay with a relative. J.S. agreed to take the child, and A.R. was placed with P.S. and J.S. on August 21, 1989. M.R. signed a voluntary placement agreement with DYFS, the original goal being reunification of the child with M.R. P.S. and J.S.'s understanding at that time was that they would take care of A.R. until DYFS said it was fine for A.R. to go home, and they would bring her back to M.R. at that time.
When A.R. first came to P.S. and J.S., it was apparent that she was failing to thrive and had substantial developmental delays in all areas of functioning. The cause of A.R.'s deficits are unclear, although they are consistent with fetal alcohol syndrome or fetal drug exposure, as well as inadequate parenting during her first year. M.R. denies substance abuse during her pregnancy. Soon after A.R.'s placement with them, P.S. and J.S. took A.R. to a pediatrician, a neurologist, and then various developmental specialists, continuing to follow up in all areas. In September 1989, P.S. and J.S. took A.R. to see Dr. Aparna Mallik, a neuro-developmental pediatrician with the Child Developmental Center at St. Joseph's Hospital, for a complete developmental evaluation. P.S. and J.S. also enrolled A.R. in a special education program, where she continued for two years, in order to address her developmental delays and neurological impairments. During that time A.R. worked at the child center with several teachers specializing in learning disabilities, as well as physical, speech and occupational therapists.
When A.R. was three years old, P.S. and J.S. enrolled her in a pre-school handicapped program, which she attended on a daily basis. At five years of age, P.S. and J.S. had A.R. reevaluated, at which time it was determined that she should be enrolled in a special education kindergarten. Since the first grade, A.R. has been enrolled in special education classes for perceptually and neurologically impaired children, and has been monitored and evaluated regularly by the township public schools' child study team. J.S. and P.S. have had A.R. evaluated on a regular basis by physicians, psychologists and educational specialists, to ensure that she receives the appropriate care she requires.
A.R. apparently is functioning at a higher level than expected, given her condition at the time of her placement with J.S. and P.S. By all accounts they have provided exceptional parenting, and A.R. has also received unusual care and attention from their three teenage children, whom A.R. describes as her brothers and sister. Despite her progress, there is little doubt that A.R. is a child who continues to have very special needs, and has neurological disorders which cause her to tire easily and to have difficulty studying. A.R. is in continuing need of speech, language and occupational therapy. J.S. testified that it has been three times more difficult raising A.R. than it was raising her other three children, but her devotion and love for the child were apparent to the trial judge. There is no question about the quality of parenting A.R. receives from J.S. and P.S. and their family.
Continuing with M.R.'s history, after the initial court hearing in January 1990, M.R. voluntarily entered a twenty-eight day, in-patient rehabilitation program at John Runnells Hospital. She successfully completed the program, where she met her present husband, T.W. Immediately upon completion of the program, defendant enrolled in an out-patient program at Genesis, with meetings every night from 6:00 p.m. to 10:00 p.m. and a three to four hour session with a counselor on Saturday or Sunday.
*1176 The defendant married T.W. on February 24, 1991. She attended NA and AA meetings with him, and evidence of their attendance in 1992 was provided to DYFS. T.W. also completed the treatment program at Genesis, and they attended a Genesis couples' group together. M.R. also completed a parenting skills training class, along with T.W., in May 1992.
At the time of trial, M.R. was a forty-seven year old woman with a chronic history of alcohol and prescription drug abuse. There is no evidence that M.R. has returned to any substance abuse since her entry into rehabilitation. M.R.'s husband, T.W., is a thirty-three year old man with an equally if not more serious history of substance abuse, as well as bipolar disorder for which he must take lithium on a regular basis. There is some evidence of relapses by T.W. M.R. does not work, but is enrolled in school to train for a job in the computer field. She described T.W. as a self-employed mechanic. M.R.'s visitation history has involved T.W., his parents, and to a lesser extent his sisters. The trial judge noted M.R.'s supportive in-law family, but did not address the question of how M.R.'s apparent dependence on her husband's family should affect potential reunification with A.R.
At trial, the only expert who testified was Dr. Martha Page, a clinical psychologist, whose testimony was offered by J.S. and P.S. Dr. Page testified that she had evaluated A.R. on nine occasions between 1991 and December 1996. Dr. Page found that A.R. suffered from "developmental lags," but that J.S. and P.S. were offering her appropriate care and stimulation to counteract these lags. Specifically, Dr. Page found A.R. was functioning well below her age level in communication, personal care, motor skills, and interpersonal skills, and was neurologically impaired. She also said that despite the good care A.R. was receiving from J.S. and P.S., she continued to have difficulties learning, communicating, and comprehending complex concepts. According to Dr. Page, A.R. would continue to need special education and the encouragement of her foster parents and siblings.
Based on A.R.'s relationship with J.S. and P.S. and her attitudes toward M.R., Dr. Page concurred with the view that to remove A.R. from J.S. and P.S.'s home would result in harmful consequences to the child. She opined throughout the course of her involvement with A.R. that adoption would be appropriate so she might have "consistency and stability." For the child to continue to make progress, Dr. Page said she would require "super parenting," although even that was no guarantee of success. Dr. Page noted that after seven years of visitation with M.R., A.R.'s attitude toward M.R. showed that she felt no "ties to the biological mother," whereas she was bonded to J.S. and P.S. just as if they were her parents. In fact, Dr. Page said A.R. had not even bonded to M.R. as a child might to an aunt, nor did she have any bond with C.B., her natural brother. Although she personally had never done a psychological evaluation of M.R., based on the reports she saw in the DYFS files, Dr. Page concluded that M.R. lacked the necessary "super parenting" skills to raise A.R., and A.R. would suffer if taken out of her present home. In sum, she concluded that because of A.R.'s special needs, M.R. lacked the appropriate abilities to successfully remedy A.R.'s problems, including the likely trauma of separation from J.S. and P.S. and their children.
The Supreme Court has described Dr. Page's adherence to a theory of child development that "children [are] highly vulnerable and fragile" and that bonding with a parent figure is crucial. See J.C., supra, 129 N.J. at 19, 608 A.2d 1312. As the court points out, there are psychologists who are critical of this theory, on the ground that it "overestimates the importance of continuity in care" relative to other factors affecting child development. Id. at 20, 608 A.2d 1312.
The DYFS caseworker who testified, Judith Gerson, had limited personal knowledge of the parties, having taken over A.R.'s case only in 1995. Her testimony largely was to describe numerous reports and records contained in DYFS's files with respect to A.R.'s progress, including the five-year-old December 23, 1992, report of another psychologist, Dr. Frank J. Dyer. Dr. Dyer's evaluation and *1177 report were provided to DYFS at its request, and contained an assessment of M.R., her husband, T.W., as well as the children, A.R. and C.B. Dr. Dyer found each child's IQ to be in the mildly retarded range. In assessing M.R. and her husband, Dr. Dyer concluded at the end of 1992:
[M.R.] appears to be adequately established in her program of recovery. She is in adequate contact with reality and is functioning within the average range intellectually. She displays the immaturity, dependency, and egocentricity associated with a histrionic personality disorder. While this client requires further counseling to work on these characteristics, she does not suffer from any psychological defect that would categorically exclude her as a candidate for parenting her two children. Further, [M.R.] appears to have an adequate grasp of the special needs of both children. There is some question, however, as to whether she is presently capable of attending to those needs as conscientiously as are their present caretakers.
[T.W.] is an immature, dependant individual with chronic substance abuse problems. His most recent episode of dangerous behavior is particularly disturbing, as it represents a very severe regression in adaptive ego functioning and was the third such episode to which the subject admits. At the present time [T.W.] has found stable employment in a skilled trade and appears to be drug free. He will continue to require vigilant monitoring, with random urinalysis, in order to guard against the possibility of a relapse into drug abuse, with its dangerous behavioral consequences. He also requires continuing psychiatric care for medication monitoring. This should be supplemented by psychotherapy focusing on development of autonomy, impulse control, and relapse prevention. He is presently capable of relating to [M.R.]'s children in an appropriate and affectionate manner. When drug free, [T.W.] is capable of functioning as a secondary caretaker for them.
Both [C.R. and A.R.] are seriously handicapped children who require structure, stability, stimulation, and a higher than normal quality of care and supervision. Both children have a positive emotional connection to their respective caretakers. Clearly [A.R.] is bonded to her foster mother, whom she regards as her central love object and attachment figure. While [C.R.] is also attached to his foster mother, he also has a profound emotional tie to his birth mother.
If these children were removed from their foster parents, both would suffer a deep emotional loss. In [C.R.]'s case this loss would be substantially offset by his preexisting attachment to his mother. In [A.R.]'s case, because of her earlier entrance into foster care and the foster mother's intense involvement with her, the loss would be more debilitating. While this child would fare much better in the context of a continuous and stable placement with her current caretaker, who is extraordinarily attentive to her needs, there is no factor in the psychological makeup of either the birth mother or stepfather that would preclude them from providing adequate care for her. Both parties are capable of responding appropriately to this child's emotional distress and grieving if the Court should decide to remove her from her current placement to return her to the birth mother.
Dr. Anthony V. D'Urso, a psychologist who was consulted by M.R. for purposes of trial and who rendered a written report, did not testify. When M.R. did not offer his testimony, J.S. and P.S. sought to reopen the trial in order to call him as their witness. Their application was denied. The lengthy, undated report described M.R. as "a marginally adequate caretaker with support....not likely to anticipate the needs of her children...." He opined that due to her "marginal ability to cope with stress, her recovery should be considered fragile." Dr. D'Urso found M.R. unlikely to "be able to compensate for the loss and trauma" the child would suffer if her bonds to P.S. and J.S. were severed.
In support of their motion for a stay, J.S. and P.S. submitted a post-trial letter from the pediatrician who had treated A.R. over the previous seven-and-one-half years, describing *1178 A.R. as "a child with significant motor and intellectual delay, possibly due in part or entirely to fetal alcohol syndrome." The pediatrician, Dr. Alvin Edelstein, opined that "removal of this child to another home may very likely cause irreparable harm." J.S. and P.S. also submitted a letter from Dr. Mallik, A.R.'s neuro-developmental pediatrician and Assistant Director of the Child Development Center at St. Joseph's Hospital, who has known the child since she was placed with J.S. and P.S. Dr. Mallik described the child as "neurologically impaired," and expressed her concern that removing A.R. from J.S. and P.S. "may very well cause irreparable harm to her." Dr. Mallik did not testify at trial.
In his oral opinion, the judge described the issues before him in the following terms:
Now, as I indicated, in this case, [J.S and P.S.] have done an extraordinary job in raising this child. And the emotional condition of the child is an extremely important aspect in assessing the parent/child relationship and whether or not the biological relationship should be terminated. The visitation and contact that the child has had with the biological parent is an important factor to consider, as well as the substantial and enduring emotional and psychological injury that can constitute harm to the child, which would warrant a finding of unfitness. The hearing, which we conducted in this case, was designed to be a broad inquiry into all the circumstances relating to the relationship between the parent and biological child; and the child and the family withwho has had custody of her, whowith whom she resides as a member of that household. And it has to include an assessment of that significance to her relationship with them and the relationship with the biological childbiological parent, rather, dealing with the issue of fitness. The Court is required to determine the need of the child for permanency and stability, and whether continuation of the parent/child relationship will undermine that need.
....
Each case is fact sensitive and needs to be addressed on the facts. Abandonment, in this context, requires an examination of the state of mind that indicates a willful or purposeful refutation of parental responsibility.
Apparently viewing abandonment as a precondition for termination, the judge made the following findings and drew the legal conclusion that plaintiffs had not proven, by clear and convincing evidence, facts that warranted the termination of M.R.'s parental rights.
I listened to the testimony of all the witnesses here before the Court. And I have no doubt whatsoever thatin the sincerity of [J.S.] and her family's position with regard to this child. And the fact that this child is, for all intents and purposes, a member of that household. There is no doubt that [J.S and P.S.]'s lovelove [A.R.], that they have treated her as their own child, and that she is an integrated member of that family unit. But by the same token, the Court is satisfied that based on the testimony that's been presented and all of the evidence, the Court is satisfied that [M.R.] is sincere in her position, dealing with her desire to maintain the relationship with her child; that she has explored possible options to resolve this outside of thethe Court system; and that she had taken the steps necessary to put some closure to this, to be able to be a fit parent.
It leaves the Court in a very difficult position, because it's very clear that the child needs the nurturing and support of [J.S and P.S.], and the environment that they provide, thethe care and love that they provide. And yet, the evidence here, falls short of establishing, by clear and convincing evidence, that the parental rights of [M.R.] should be terminated. It is not an easy case, nor perhaps should it be, under all of these circumstances.
I am satisfied that [M.R.] is presently fit to be a parent. She has the support of an extended family unit and husband. She's taken parenting courses, she's dealt with her drug problem, and she's done everything expected of her by the legal system. She has consistently visited with the child and she has maintained a relationship with *1179 the child. And at the same time, she's had a caring and good relationship with her cousin, who has fulfilled that parental void that she left, to supprovide for the nurturing and emotional support of her child; and to fill in, where she could not, in offering thatthat support, guidance, advice, instruction, and everything that goes with parenting.
The Court is therefore satisfied that the complaint for adoption cannot be granted, because it requires that there be a termination of parental rights, which cannot be done in the absence of clear and convincing evidence that the legal criteria is met, which is notwhich is not in this case.
Now, that doesn't end this case, and it doesn't end the involvement of the Court with this child, nor does it do anything to change the present situation. Because I'm satisfied that, because of the length of time that the child has been with [J.S and P.S.], and because of the fact that this child is, for all inten[ts and] purposes, a bonded child to this family, that something more needs to be done with regard this child.
....But I'm satisfied that the best interest of thethe child required that there not be an immediate transfer of custody at this time. I'm satisfied that the best interest of the child dictate that she remain in the custody of her aunt and uncle [sic], with whom she was voluntarily placed. I'm concerned about the child's safety, happiness, mental, and physical well-being, which warrants, at present, that there be no change of custody at this time.
And I'm satisfied, that after considering the case law in the Matter of Guardianship of J.C., that while there was a period of that time that [M.R.] was intinattentive to her duties as a parent to this child, that it's not been such a prolonged and grievous inattention by her, that it has resulted in the development of a disproportionately stronger tie between the child and the foster parents. I'm satisfied that [M.R.] attempted appropriately to stop that from happening and that the child has not had such a bonding relationship which wouldwhich would result in such profound harm that custodystrike that, that a severing of parental rights would be warranted. I'm therefore satisfied, that under the circumstances, that the child should remain with her aunt and uncle [sic] subject to the child attending counseling and the parties attending counseling directed at the child's eventual return to the biological mother, if that can be accomplished. It may very well be that it takes a long of time for that to happen. It may very well be that the psychologist recommend some other alternatives, such as long term continuation of the custody in the case. It's a unique case. It may require a unique remedy. But the law is clear. I can't, under the law, grant the adoption, even though I am satisfied that this child is, for all intents and purposes, a member of [J.S and P.S.'s] household.

(Emphasis added.)
We defer to the trial judge's findings of fact so long as they are supported by substantial, credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974). However, such deference is inappropriate when the findings are inconsistent on their face. Legal conclusions are always subject to our independent review. In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997).
There can be no question that the parent-child relationship is part of the precious package of individual rights and liberties protected by our constitutional democracy.
The right of a parent to enjoy a relationship with his or her child is considered fundamental, and is constitutionally protected. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L. Ed.2d 551 (1972); New Jersey Div. of Youth & Family Services v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986). Termination of parental rightsin contrast to the loss of custody of one's childrenpermanently severs the relationship between children and their biological parents. In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). The United States Supreme Court in Santosky v. Kramer, 455 U.S. 745, 762-64, 102 S.Ct. 1388, 1399-1400, 71 L. Ed.2d 599, 612-13 *1180 (1982), has evaluated the evidentiary standard to be applied in termination proceedings, and held that the constitutional concern for the parental interest is heightened by a combination of factors. Those factors include the nature of this fundamental right, the permanency of the threatened loss, the complexity and subjectivity involved in evaluating parental fitness.
Thus, the Supreme Court has insisted that the State may not permanently deprive a parent of all rights to the child unless the State has shown by clear and convincing evidence adduced at a full hearing that the parent is "unfit." Id. at 769, 102 S.Ct. at 1403, 71 L. Ed.2d at 616; Stanley, supra, 405 U.S. 645, 92 S.Ct. 1208, 31 L. Ed.2d 551.
[Matter of L.A.S., 134 N.J. 127, 132-33, 631 A.2d 928 (1993).]
Nevertheless, that right is not absolute. Sorentino v. Family and Children's Soc'y of Elizabeth, 74 N.J. 313, 319, 378 A.2d 18 (1977) (Sorentino II). No adoption can be considered unless the parental rights of the biological parents have first been terminated. J.C., supra, 129 N.J. at 5, 608 A.2d 1312.
In Sorentino v. Family and Children's Soc'y of Elizabeth, 72 N.J. 127, 131, 367 A.2d 1168 (1976) (Sorentino I), after finding the biological mother's consent to adoption of her newborn baby to be a nullity because of undue duress, the Supreme Court recognized that custody nevertheless should not be returned to the biological mother unless she could prove that the child would not suffer serious psychological harm as a result of removing her from foster parents with whom she had lived for thirty of her thirty-one months of life.
The Court explained its remand:
We are given pause, however, in adjudicating such a summary and drastic change in the life circumstances of this child, now 31 months old. We are confronted with the potentiality of serious psychological injury to the child, in the evaluation of which substantial significance should attach to the length of time the child has been with the prospective adopting parents and to the quality of the developing relationship.... We are not suggesting that such a potentiality suffices as a matter of law to justify a reversal in this case. However, the potentiality does require a hearing and determination on the issue.
....
The court cannot evade its responsibility, as parens patriae of all minor children, to preserve them from harm. See In re P. and wife, supra, 114 N.J.Super. at 591, 277 A.2d 566 and cases there cited; Small v. Rockfeld, 66 N.J. 231, 253-54, 330 A.2d 335, (1974) (Conford, P.J.A.D. (temporarily assigned), dissenting on other grounds). The possibility of serious psychological harm to the child in this case transcends all other considerations. The court's responsibility in the matter is not lessened by the circumstance that plaintiffs are not alone responsible for the delay....
[Id. at 131-32, 367 A.2d 1168 (emphasis added) (other citations omitted).]
The trial court, on remand, found convincing evidence of likely serious harm to the child, and the biological parents renewed their appeal. Although the Supreme Court remanded the case once again because the biological parents had not been given adequate notice of the adoption petition, the Court continued custody with the prospective adoptive parents and addressed the competing policies underlying termination issues:
A paramount concern of the Adoption Act is the maintenance of stable, continuing relationships between parent and child. This is the basis for the policy behind custody cases which provides for parental visitation. The parent-child relationship is maintained with the hopeful expectation that the natural parent will be able in the future to resume permanent custody of the child.
....
However, where [the emotional and psychological relationship with the biological parent] does not exist, there can be no separation. This is especially so where the absence of any such relationship has been occasioned by the purposeful conduct of the natural parent or by indifference or *1181 neglect. In that event another important policy of the Act comes into play: the protection of the stability and permanence of the new familial grouping. In those situations our courts have recognized the absence of a relationship, classified the abandonment as a forsaking of parental status where the facts warranted it, terminated the unutilized legal right and granted the adoption.
In sum, those cases in which our courts have refused to terminate parental rights have encouraged the maintenance of an existing relationship. Those cases in which our courts have terminated parental rights on grounds of forsaken parental obligations have encouraged the establishment of a permanent home by protecting the child from interference from a parent with whom it has no relationship.
[74 N.J. at 322-24, 378 A.2d 18 (citations omitted).]
In Sorentino I and Sorentino II, unlike the case before us, the natural parents apparently had had no contact whatsoever with the child. The Court emphasized their lack of contact and delay in filing for custody as evidence "strongly [pointing] to the conclusion that there has been an abandonment." Id. at 326, 378 A.2d 18.
The competing policies described by the Court in Sorentino II were emphasized again by the Court in 1986:
Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed `essential,' * * * `basic civil rights of man,' * * * and `[r]ights far more precious * * * than property rights' * * *." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L. Ed.2d 551, 558 (1972) (citations omitted). The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected. On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L. Ed.2d 101, 119 (1979) (citing Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 1540, 32 L. Ed.2d 15, 33 (1972)).
These two concepts run so deeply in our culture that we find their reconciliation to be very difficult. Preservation of the traditional family is a staple of social rhetoric. It is that model of the family that our popular culture portrays. Yet, reality must intrude into this idealized view of American family life.... Thus, it has been held that the right of parents to be free from governmental intrusion is not absolute. "The State as parens patriae may act to protect minor children from serious physical or emotional harm. In some instances this may require a partial or complete severance of the parent-child relationship." In re Dep't of Pub. Welfare, 383 Mass. 573, 587, 421 N.E.2d 28, 36 (1981).
[New Jersey Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986).]
In outlining the standards applicable to plaintiffs' application for termination of M.R.'s parental rights respecting A.R., we are informed by In re Guardianship of J.C., supra. In J.C. the Court declared that termination based upon the child's "best interest" pursuant to N.J.S.A. 30:4C-15.1 and -20 does not mean that termination is appropriate just because the child "might be better off" with the foster or prospective adoptive parents. J.C., supra, 129 N.J. at 19, 608 A.2d 1312 (citing In re Baby M., 109 N.J. 396, 445, 537 A.2d 1227 (1988)).
We read J.C. to distinguish between an impermissible "better interest" test, with the attendant risk of terminating biological parental rights because someone with greater financial, emotional, or intellectual resources seeks to adopt, and a true "bonding evaluation," taking into account the best interest of the child, with the goal of preventing serious, long-lasting psychological harm resulting from termination of a psychological parent-child relationship. Indeed, in the introductory paragraph of J.C., Justice Handler posed the very question confronting the court here:

*1182 The State may seek guardianship of a child placed in foster care if it believes that the child has been abandoned by his or her natural parents or would suffer injury if returned to them. Transferring guardianship to the State terminates all the parental rights of the natural parents and is a prerequisite to having the child adopted by the foster parents or by another family. The Court in this case, as in the companion case, In re K.L.F., 129 N.J. 32, 608 A.2d 1327 (1992), is required to determine whether the parental rights of a natural mother should be terminated based on the need to protect children from potential harm that may result from being separated from foster parents with whom the children may have formed parental bonds.

[129 N.J. at 5, 608 A.2d at 1313 (emphasis added).]
In J.C., the Court reiterated its earlier reasoning in A.W., supra, 103 N.J. at 603, 512 A.2d 438, that a parent's protected interest in the relationship with a child is limited by the child's interest in physical and emotional safety. 129 N.J. at 8, 608 A.2d 1312. See also K.L.F., supra, 129 N.J. at 37, 608 A.2d 1327, noting "the statutory scheme must balance the constitutional rights of parents against the interests and rights of their natural-born children." Finding that termination requires clear and convincing proof that failure to terminate will substantially prejudice the child's best interest, the J.C. Court accepted the best interest standard of A.W., now embodied in the 1991 amendment to N.J.S.A. 30:4C-15, saying:
The Court then set out four specific findings that a trial court should make before it terminates parental rights. The first finding is that the child's health and development have been or will be seriously impaired by the parental relationship. Id. at 604-05, 512 A.2d 438. Secondly, the court must conclude that the parents are unable or unwilling to eliminate the harm and that a delay in permanent placement will add to the harm. Id. at 607, 512 A.2d 438. Third, the court should be convinced that alternatives to terminating parental rights have been thoroughly explored and exhausted, including sufficient efforts made to help the parents cure the problems that led to the placement. Id. at 608-10, 512 A.2d 438. Fourth, all of those considerations must inform the determination that termination of parental rights will not do more harm than good. Id. at 610, 512 A.2d 438.
[J.C., supra, 129 N.J. at 9, 608 A.2d 1312.]
Particularly pertinent here is the Court's admonition that
[i]n cases in which DYFS seeks termination of parental rights, not on grounds of current unfitness but because of potential harm to the child based on separation from a foster parent with whom the child has bonded, the quality of the proof adduced must be consistent with the interests at stake.

[Id. at 18, 608 A.2d 1312.]
This court had affirmed the trial court in J.C., which "held that the mother's parental rights should be terminated, emphasizing the psychological harm that would result from breaking the bonds that each child had formed with foster caretakers." Id. at 5, 608 A.2d 1312. Although the Supreme Court reversed the judgment terminating parental rights, it did so with the following instruction:
To the extent that the quality of the child's relationship with foster parents may be relevant to termination of the natural parents' status, that relationship must be viewed not in isolation but in a broader context that includes as well the quality of the child's relationship with his or her natural parents. As suggested by In re Guardianship of J.R., 174 N.J.Super. 211, 223, 416 A.2d 62 (App.Div.1980), prolonged inattention by natural parents that permits the development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the severing of which would cause profound harma harm attributable to the natural parents and cognizable under the standards set forth in A.W., supra, 103 N.J. at 604-11, 512 A.2d 438.

*1183 ....
DYFS must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm.

[Id. at 18-19, 608 A.2d 1312.]
The Court further instructed that
[s]uch proof should include the testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent. In hearing a petition for termination in which the fitness of natural parents is neither relied on nor disputed by the agency, the trial court must also consider parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child.

[Id. at 19, 608 A.2d 1312.]
There are many similarities but also several significant differences between the facts before the Court in J.C. and those before us. In each case, the biological mother voluntarily placed the child[5] in foster care, although J.C.'s foster parents and proposed adoptive parents were selected by DYFS and were strangers to the mother. In each case, the mother found herself unable to care for the child because of substance abuse and addiction, M.R. to alcohol and J.C.'s mother to illegal drugs. And in each case, the child suffered neurological deficits and developmental disabilities.
A.R.'s circumstances differ from J.C.'s in certain respects which, if anything, suggest a greater likelihood of harm in the event of separation from her foster family. Whereas J.C. was placed at one month of age, and had been with her foster family for thirty-one months at time of trial, A.R. was placed with J.S. and P.S. at fifteen months, and had been with them for more than seven years at the time of trial. The most significant difference, however, is that J.C. was found to have some emotional ties to her mother, whereas A.R. was found to lack any real feeling for the woman she calls "Aunt Cookie" or "M______" (M.R.'s first name).[6]
The adoption statute, N.J.S.A. 9:3-46 (as of the trial date),[7] provides in pertinent part that *1184 a. [no adoption can be entered over a natural parent's objection] unless the court finds:
(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or
(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.
The regular and expected functions of care and support of a child shall include ... (a) the maintenance of a relationship with the child such that the child perceives the person as [her] parent....

[N.J.S.A. 9:3-46a.]
This M.R. clearly has been unable to do over a period of seven years, far longer than the presumptive six months set forth in the pre-1998 statute:
A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in paragraph (1) or (2) has occurred for six or more months.

[Id.]
As we recently said when we reversed an order dismissing a petition to terminate parental rights,
[w]hen the child's biological parent resists termination of parental rights, our function is to decide whether the parent can raise the child without causing harm. In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). The cornerstone of our inquiry is not whether the parent is fit, but whether he can become fit to assume the parental role within time to meet the child's needs. Ibid.

[In re Adoption of a Child by W.P. and M.P., 308 N.J.Super. 376, 383, 706 A.2d 198 (App.Div.1998).]
Although the amended statute is not effective until September 11 of this year, the legislative policy and intent reflected in the amendment[8] informs our interpretation and application of the current law. See Shell Oil Co. v. Marinello, 63 N.J. 402, 409, 307 A.2d 598 (1973).
N.J.S.A. 9:3-46, as amended, contemplates a combined action, such as this, where termination and adoption are considered together, and explicitly contemplates a "contest" between the proposed adoptive parents and a biological parent. The emphasis in the amended adoption statute has shifted, in that the amended statute affirmatively instructs the court to allow the adoption if the prescribed conditions are found, instead of prohibiting the adoption unless the prescribed conditions are found. Those conditions remain unchanged. Most important of all is that the amended statute unequivocally provides that "the standard shall be the best interests of the child." Nothing in the recent amendment is inconsistent with the Supreme Court's instructions in Sorentino I and II, in A.W., or in W.P. and M.P., to consider whether reunification of the child with the biological parent will do more harm than good for the child. Our recent decision in In re Adoption of Children by G.P.B., Jr., 311 N.J.Super. 38, 709 A.2d 271 (App.Div.1998) (denying termination of the birth father's rights thereby precluding adoption by the stepfather), is distinguishable. G.P.B. was decided several days before the most recent amendment to N.J.S.A. 9:3-46 and did not implicate the question whether reunification *1185 with the biological parent will do more harm than good.
The Court in J.C. expressed its concern about "competing psychological theories of the effects of parental bonding," 129 N.J. at 19, 608 A.2d 1312, and that "the uncritical use of bonding theory can increase the risk of institutional bias." Id. at 21, 608 A.2d 1312. The Court recognized that "[p]arents with few resources rely on foster care to protect their children during difficult periods... [and] should be able to turn to the foster-care system without fear of losing their children." Id. at 20-21, 608 A.2d 1312.[9] Nonetheless, the Court recognized the goal of the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 et seq., to further each child's need for a permanent home, though not necessarily a home with a biological parent. See New Jersey Div. of Youth and Fam. Servs. v. K.M., 136 N.J. 546, 558-59, 643 A.2d 987 (1994). The goal of permanency, not necessarily of reunification, is paramount. This Bill of Rights requires a placement plan that "reflects the child's best interests," and contemplates either a "permanent placement or return home ... in a timely manner that is appropriate to the needs of the child." N.J.S.A. 9:6B-4j.
We are satisfied that many of the trial judge's findings are supported by the record. However, we find reason to examine closely those findings that appear to be internally inconsistent, as well as the application of the law to the facts. The judge explained on the one hand that J.S. and P.S.
have treated [A.R.] as their own child, and that she is an integrated member of that family unit....that the child needs the nurturing and support of [J.S and P.S.], and the environment that they provide, thethe care and love that they provide....that, because of the length of time that the child has been with [J.S and P.S.], and because of the fact that this child is, for all intensive purposes, a bonded child to this family ... I'm satisfied that the best interest of the child dictate that she remain in the custody of [J.S. and P.S.],.... I'm concerned about the child's safety, happiness, mental, and physical well-being, which warrants, at present, that there be no change of custody at this time.
However, with respect to M.R., the judge concluded that he
[could not] find that there was an abandonment by [M.R.] of the child. There was a voluntary transfer of custody, with the assistance of DYFS, to provide care for the child. But there is no evidence here to suggest an abandonment. In fact, the evidence is quite the contrary. At every stage of the proceedings, [M.R.] asserted her parental rights and asserted an intention to be reunified with the child.
Termination here is not sought based on an intentional abandonment, but on the probability that returning A.R. to M.R. will "do more harm than good," see J.C., 129 N.J. at 9, 608 A.2d at 1315, because A.R. is likely to suffer grievous harm if she is separated at age ten from the only parents (and family) she has known since infancy.
While finding that M.R. "is presently fit to be a parent," the trial judge did not and could not conclude that she had maintained anything resembling a parental relationship with A.R. Nor did he find that she was fit to provide for the exceptional needs of A.R. Indeed, the judge refused M.R. additional or unsupervised visitation pending additional planning and counseling, after finding that "the visitation is upsetting to the child, because of the confusion that the child has."
The judge recognized the key question in this case:
Now, it's very clear that it took awhile for [M.R.] to get started with regard [to] her effort to become drug free and try to *1186 deal with her problems. It took a long time for her to get started. And the question is, whetherwhether it'sshe did too little too late. And whether or not her efforts constitute a reasonable time in light of all surrounding circumstances.
However, his resolution of that question is inconsistent with his own findings regarding A.R.'s bonded relationship after more than seven years (as of the trial date) as a member of J.S. and P.S.'s family:
And I'm satisfied, that after considering the case law in the Matter of Guardianship of J.C., that while there was a period of that time that [M.R.] was intinattentive to her duties as a parent to this child, that it's not been such a prolonged and grievous inattention by her, that it has resulted in the development of a disproportionately stronger tie between the child and the foster parents. I'm satisfied that [M.R.] attempted appropriately to stop that from happening and that the child has not had such a bonding relationship which wouldwhich would result in such profound harm that custodystrike that, that a severing of parental rights would be warranted.
A parent whose serious substance abuse problem has caused her to neglect her child may at some later time in her life be rehabilitated to the point where she can be "a fit parent." But that does not necessarily make her a fit parent to the previously neglected child, whose future is now, years later, at issue. Where prior neglect created a situation in which the child has successfully bonded to another, psychological parent, the biological parent's rights may give way to the child's rights. See J.C., 129 N.J. at 25-26, 608 A.2d 1312. The child's rights are: first, not to be harmed in any way, as by removal from her only known family; and second, to have a stable, legally recognized relationship of parent and child, very likely with the foster, proposed adoptive parents. Id. at 26, 608 A.2d 1312.
We recognize the difficulty faced by a parent such as M.R., whose personal problems and vulnerability, primarily her alcohol addiction, initially brought about the foster care arrangement, and who then had to rehabilitate herself while attempting to preserve in some fashion a relationship with her children. But M.R.'s own responsibility for creating the situation in the first place cannot be ignored. And the child's life could not be put on hold. Although M.R. took advantage of all the permitted, supervised visitation, and was actually denied unsupervised visitation, there apparently was good reason for those limits to have remained in place for seven years. Unfortunately, although the record reveals yearly (and occasionally more frequent) reviews of A.R.'s status by several different judges, the record is devoid of reasons or explanations for the multiple court orders maintaining the status quo. We would like to believe that each order represents a reasoned decision. But without some record of the reasons, and given the caseload that confronts the family court, we cannot know. It may or may not be that each judge involved with the case recognized that M.R. was not ready to have unsupervised responsibility for A.R., even for visitation.
M.R. never sought custody of A.R. in any court proceeding until confronted with the notice of proposed termination of her rights and A.R.'s proposed adoption by J.S. and P.S. The record reflects that either M.R.'s in-laws, who are not related to A.R., or M.R.'s husband, T.W., have accompanied M.R. on all visitations with A.R. outside J.S. and P.S.'s home. Significantly, the child shows no attachment to M.R., viewing her weekly Thursday night visits and monthly Saturday visits as an obligation, neither terribly positive nor terribly negative. The court's in camera interview with A.R. included questions concerning visitation with M.R.:
Q.... And who is [M.R.]?
A. She's somethingsomebody that I go out with sometimes on Saturdays and I have to go out with her on Thursdays.
Q. And how do you like going out with [M.R.]?
A. I don't like it.
Q. How come?
A. Becausebecause then I miss my mommy and daddy.
*1187 A.R. told the judge that she did not think M.R. was related to her and did not know why she had to go on those visits. When asked whether she had fun on the visits, A.R. responded that she did not.
After that in camera interview with A.R., who was almost nine years old at the time of trial, the judge described her as follows:
I found her to be very bright, and very verbal, expressed herself very well, very clearly.... And sheshe did far better then I would have expected, having heard the testimony, andand having reviewed some of the reports, and considering the expert testimony. I think sheher responses to questions, were very appropriate for her age. And they evidenced the very clear understanding of what I was talking about and what her relationship is with the family unit in which she resides. She seems to be a very happy and content little girl.... And all of her responses to the questions seemed, to me, to be appropriate to her age.
As the judge noted, A.R.'s presentation surprised him in light of the reports and testimony of the several professionals who have been involved with A.R. We mention the disparity only to emphasize the importance of a more complete and up-to-date evaluation.
We are also struck by M.R.'s inappropriate and unilateral decision to tell A.R., at age seven, that M.R. is her mother and that she "came from [M.R.'s] stomach," concepts that A.R. was incapable of comprehending either intellectually or emotionally. M.R.'s failure to consult with any of A.R.'s physicians or psychologists, or with J.S. and P.S., to determine whether and how such information should be conveyed, bespeaks a lack of comprehension and sensitivity to the child's needs and welfare.
M.R. is undoubtedly sincere in her expressed belief that she is able to nurture A.R. and to provide sufficient love and attention to compensate for the loss and overcome any harm resulting from A.R.'s separation from J.S. and P.S. We cannot help wondering how accurate M.R.'s self-appraisal can be. We sense from the trial judge's remarks, contained in his oral decision, his concerns about M.R.'s ability to properly care for A.R., as well as his reluctance to impact negatively on M.R.'s rehabilitation. If we misread the trial judge, or read too much into his remarks, our remand will provide ample opportunity for him to expand his findings, within the legal guidelines we have outlined.
In our view, the error of the trial judge was in assuming that because M.R. took many positive steps toward functioning in her own life, including apparent long-term abstinence from alcohol and drug use, and because he found her "fit" to be "a parent," that finding as a matter of law precluded the termination of her parental rights with respect to A.R. The judge did not explain his implicit answer to his own question, in our view the appropriate question, whether M.R.'s rehabilitation was "too little too late," at least for A.R.
It has long been held that the biological parents' ability to cease to inflict harm, and to avoid future harm to their child's physical or mental health, are major factors in deciding whether to terminate parental rights. See, e.g., A.W., supra, 103 N.J. at 607, 512 A.2d 438 ("How long a court should be willing to wait, however, depends in part on the age of the child.") A child's need for stability, for consistency, and for permanence cannot be ignored in reaching in the most challenging decision any court can face. As our Supreme Court has recognized,
If one thing is clear, it is that the child deeply needs association with a nurturing adult. Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life.
....
In other cases, the court will have to consider whether the child has already developed "a filial relationship [with another] * * * that * * * cannot be destroyed or changed without some risk of emotional harm to the child." Sees v. Baber, supra, 74 N.J. at 222, 377 A.2d 628. Just such a relationship was recognized in Sorentino II as warranting, with proper notice, a termination of parental rights.
*1188 [A.W., supra, 103 N.J. at 610, 611, 512 A.2d 438 (footnote omitted).]
The trial judge recognized the need for additional expert opinion with respect to A.R.'s future, and even the possibility that she could never be reunited with M.R. without enduring substantial psychological harm. We conclude that the expert evidence in the record before the judge was insufficient to permit a fully informed determination whether A.R. could be separated from J.S. and P.S., and returned to the custody of M.R. in the near future, without suffering undue harm. To deny adoption on this record, and to plan to keep A.R. in limbo for some long-term reunification plan, after all the years in which she has known only J.S and P.S. as her parents and their three older children as her brothers and sister, is cruel to the child and suggests a misapplication of the statutory and common law requirements.
For that reason we remand this case to the trial court and call for additional psychological evaluations, including, without limitation, the court's appointment of an independent expert to offer additional professional insight into the critical question of likely harm to A.R. if she is removed from J.S. and P.S. in the near future. If reunification without substantial, long-term harm cannot reasonably be anticipated within a short time, termination of M.R.'s rights, freeing A.R. for adoption by J.S. and P.S., may well be appropriate. On remand, the court must consider whether, despite M.R.'s success in fighting her drug addition, and participation in certain parenting skills workshops or courses, A.R.'s interest in remaining with her bonded family on a permanent, stable, legally sanctioned basis may outweigh M.R.'s interest in the limited relationship she has had with A.R. during eight of her nine and one-half years of life.
No one is a winner in litigation of this type. "[G]iven the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." Solnit, Psychological Dimensions in Child Placement Conflicts, supra, 12 N.Y.U.Rev.L. & Soc. Change at 499.
[A.W., supra, 103 N.J. at 616, 512 A.2d 438.]
The Supreme Court has raised but not decided the question whether some form of open adoption, in which the child maintains some contact with her biological parent(s) and/or family, is permissible in New Jersey. See J.C., supra, 129 N.J. at 26, 608 A.2d 1312. Because J.S. and M.R. are cousins, and extended family gatherings have the potential for bringing them together, the court on remand, depending upon its eventual decision, should address the question of future contact.
We reverse the order dismissing the adoption complaint and ordering DYFS to prepare a reunification plan. We reinstate the complaint for adoption, and remand to the family court for further proceedings consistent with this opinion, and with due regard to the 1998 amendment to N.J.S.A. 9:3-46. Within thirty days of this decision, the court shall appoint an independent expert to undertake a bonding evaluation consistent with J.C. Completion of the expert's report and a further hearing shall be scheduled on an expedited basis. On remand, the trial judge shall have the discretion to receive such additional testimony or other evidence as he shall deem appropriate. That additional evidence may include updated evaluations and testimony by professionals who have previously treated or evaluated A.R., M.R. or T.W.
NOTES
[1] A.R. was eight years and nine months old at the time of trial.
[2] C.B.'s status is not an issue in this case.
[3] D.B. defaulted and was not involved in the proceedings below.
[4] It is most unfortunate, in our view, that the cases were not addressed in one county, instead of having separate proceedings involving the same biological mother in different counties, before different judges, over a period of years.
[5] The proceeding in J.C. actually involved two children whose adoption was contested. Our discussion relates to one of the children, J.C.
[6] In K.L.F., supra, 129 N.J. 32, 608 A.2d 1327, termination was sought on the ground of abandonment, and denied because the facts showed there had not been a voluntary or intentional abandonment. The child, who was two-and-one-half years old when the termination petition was filed, had been in foster care with a pre-adoptive family for ten months.
[7] Amendments to N.J.S.A. 9:3-46 were approved May 14, 1998, effective September 11, 1998. L.1998 c. 20. As amended, N.J.S.A. 9:3-46 provides, in pertinent part:

In a contest between a person who is entitled to notice pursuant to [N.J.S.A. 9:3-45], objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of a child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations for the birth and care of the child, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.
A judgment of adoption shall be entered over an objection of a person who is entitled to notice ... if the court finds ...:
(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or
(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.
The regular and expected functions of care and support of a child shall include the following:
(a) the maintenance of a relationship with the child such that the child perceives the person as his parent; ...
A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in paragraph (1) or (2) has occurred during the six month period prior to the placement of the child for adoption, or within 120 days after the birth of a child or prior to the date of the preliminary hearing, whichever occurs first, in the case of a child placed for adoption as a newborn infant.
(Emphasis added.)
[8] We note the Senate and Assembly Committee statements to the amending statute, stating the specific purpose "to secure permanence in adoption" by requiring unmarried parents to acknowledge paternity as a prerequisite to notice and the right to object to an adoption. The committee statements add:

If there is an objection, the bill provides that the standard to be used in resolving the dispute shall be the best interest of the child, which requires a parent to affirmatively assume the role of parent.
[Senate Women's Issues, Children and Family Services Committee Statement and Assembly Senior Issues and Community Services Committee Statement to Senate, No. 56 (February 23, 1998).]
[9] Justice Clifford, concurring in the result in J.C., would prohibit termination of parental rights unless clear and convincing evidence shows that DYFS has complied fully with the Child Placement Review Act, N.J.S.A. 30:4C-50 et seq., with respect to planning and implementing its plans for reunification of the biological family. 129 N.J. at 31, 608 A.2d 1312 (Clifford, J., concurring). See also K.L.F., supra. 129 N.J. at 46-47, 608 A.2d 1327 (Clifford, J., concurring). The Court did not go that far when it prescribed preconditions for termination based on predictable harm from separating the child from her psychologically bonded family. Justice Clifford's requirement would risk harming the child in order to punish or make up for an agency lapse.