# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0245-20
     A-0246-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

T.B. and C.B.,

  Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.B.
and S.B., minors.

_____

   Submitted September 15, 2021 – Decided November 1, 2021

   Before Judges Messano and Enright.

   On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0065-18.

Joseph E. Krakora, Public Defender, attorney for appellant T.B. (Bruce P. Lee, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant C.B. (Ruth Harrigan, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Tim Sheehan, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendants T.B. (Todd) and C.B. (Carla) appeal the September 3, 2020 judgment terminating their parental rights to their daughters, L.B. (Laura) and S.B. (Sara), born in 2016 and 2017, respectively.[1] On appeal, both defendants contend the judge erred by concluding the Division of Child Protection and Permanency (Division) satisfied the four prongs of the statutory "best interests of the child" standard, N.J.S.A. 30:4C:15.1(a), although Todd limits his arguments to the Division's alleged failure to prove prongs three and four. Both defendants also argue that the judge improperly considered inadmissible hearsay

---

[1] We use initials and pseudonyms pursuant to Rule 1:38-3(d)(12).

evidence. Carla additionally contends the judge's bias toward her and her counsel warrants reversal.

The Division and the Law Guardian urge us to affirm the order terminating defendants' parental rights, and both argue that the judge conducted the trial fairly and did not consider inadmissible hearsay evidence in rendering his decision.

After carefully reviewing the record, we affirm.

I.

The Division first became involved with the family the day after Laura's birth in 2016, when the hospital made a referral because Carla tested positive for opiates and benzodiazepine upon admission, and Laura's initial drug screen was positive. The Division filed a verified complaint seeking care and supervision of Laura, which the court granted. Approximately two months later, in late April 2016, the Title Nine complaint was dismissed, and the matter proceeded under Title Thirty. The Division instituted a safety plan and provided substance abuse counseling services to defendants, with very limited sporadic compliance by both.

When Sara was born in August 2017, the hospital again made a referral to the Division because Carla and the baby tested positive for opiates. The doctors

A-0245-20

expressed concerns that Sara might experience withdrawal symptoms, but those concerns were resolved without medical intervention. On September 6, the Division filed an amended verified complaint seeking care and supervision of the children, who were now living with their maternal grandparents, D.B. (Denise) and A.B. (Alan). The judge ordered Laura and Sara to remain in the temporary custody of their grandparents and also ordered both defendants to submit to substance abuse evaluations; visitations with the children thereafter were to be supervised.

We address what transpired prior to the guardianship trial, which commenced against both defendants on February 6, 2019, in the context of evidence adduced at trial. On the first day of testimony, although Todd's counsel represented that defendant had called and claimed to be in transit, Todd never arrived.

Objections to the introduction of documentary evidence commenced with the first witness, Jillian Kolupanowich, the Division's adoption caseworker. Kolupanowich was the "custodian of the Division record on this case" and identified an "updated evidence list," P-1 through -53, as records kept in the Division's "ordinary course of business." The judge interjected, noting "this witness can only authenticate the Division records." The Deputy Attorney

General (DAG) representing the Division responded that "collaterals" were admissible because they were "part of the Division records." The judge disagreed, stating only "Division[] reports, contact sheets, [and] . . . records . . . prepared in the Division" were admissible. He ruled that additional exhibits and evidence must be authenticated separately.

Carla's counsel again objected when the DAG showed Kolupanowich a contact sheet to refresh her recollection, even though the witness never said she did not recall when she served Carla with the guardianship complaint. The judge patiently explained to the DAG both the procedural basis for the objection, and the substantive objection to embedded hearsay in the document. He asked the DAG to specifically identify which documents she sought to admit into evidence, and then entertained specific objections from Carla's counsel without ruling on them.

The judge said he would "always be looking to the records . . . on the issue of hearsay, but the distinction is . . . i[f] it's unreliable hearsay." Defense counsel said he understood, but "the problem is for . . . the Appellate Division record, they can't be inside your mind and know exactly what . . . you relied upon or not." The DAG responded, "the Appellate Division will rely on the [c]ourt's findings."

A-0245-20

Carla's counsel proceeded to cite examples of embedded hearsay in the proffered documents. As to some objections, the judge made inquiry of the DAG, noting at one point he was rejecting again the blanket assertion that documents were admissible simply because they were included in the Division's records. He said: "I've heard this argument over the years and . . . it doesn't work. Just because it's in your files doesn't mean it's the Division records." The judge then ruled that "[s]ubject to those objections that have been listed, . . . and to the extent that [the documents] are truly Division records, I will admit those exhibits . . . ." Carla's counsel asked whether the judge "at some point [would] rule on each" objection. The following colloquy ensued:

> Judge: No, . . . when I lay out the facts, I will . . . relate what . . . I rely on. If I don't mention it . . . , I'm not relying on it. I'm not going to go through every one of your objections to every piece of document, I'm not doing that.
>
> Defense counsel: [T]hen we won't end up with a redacted version of the evidence for . . . Appellate purposes.
>
> Judge: [T]he Appellate Division has done a fine job over the years . . . doing it exactly this way. We don't go through every single objection to every conversation in the documents, okay?
>
> Defense counsel: Well, note my objection for the record.

A-0245-20

The DAG argued that much of the alleged embedded hearsay was not hearsay at all, because the Division was not relying upon the statements to prove the truth of the matters asserted. See N.J.R.E. 801(c)(2). The judge signaled his understanding of the Division's argument.

Kolupanowich's testimony resumed. Carla was not living with Todd when Kolupanowich first met her in April 2018 and referred Carla for a substance abuse evaluation. Her efforts to contact Todd at the start of the litigation were unsuccessful, in part, because he had been discharged from a substance abuse treatment program for noncompliance. Kolupanowich testified about both parents' sporadic compliance with referrals. She was unaware of any visitation that took place between Carla, Todd and the children between May 2 and June 26, 2018, and she had no contact with either parent during that timeframe, despite several attempts.

Carla initially agreed to a hair follicle test, but, due to various delays, the test was not performed until September 4, 2018. It was positive for opiates. Carla was referred for a follow up assessment, failed to comply, and was terminated from the program. Kolupanowich testified that contact with Carla was "always sporadic" after October 2018, and she missed scheduled supervised visits with Laura and Sara.

A-0245-20

Kolupanowich said that the Division continued making efforts to contact Todd at the start of the litigation. He was not served with the guardianship complaint until he appeared in court in May 2018. In July, Kolupanowich learned that Todd was incarcerated; in August, she attempted to reach him, without success, at an address which was Todd's mother's residence. Todd thwarted substance abuse evaluations Kolupanowich arranged for him by not attending, and the YMCA, which was supervising visitation with the children, terminated Todd's visits for lack of "consistent communication with the YMCA worker."[2]

Todd was not present at trial for the second day of testimony, although counsel indicated he was "pulling up on the bus right now." It was not until

_____

[2] We note that throughout much of the testimony, the judge made rulings on defendants' objections based on hearsay or other grounds. For example, in response to an objection to the testimony about the YMCA's termination of Todd's supervised visitation, the judge ruled this was an exception to the hearsay rule because the Division contracted the YMCA to provide the service. See, e.g., N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 524 (App. Div. 2017) ("Reports are admissible when they are prepared by a professional consultant of the Division . . . for the purpose of guiding the Division in determining the appropriate course of action, and when they are maintained in the regular course of the Division's business."). We offer no opinion on this ruling which is not specifically challenged on appeal. We use it only to exemplify the judge's ongoing rulings on defendants' objections regarding the introduction of evidence contained in documents offered by the Division.

much later in the morning session that the judge noted, "The record should reflect that [defendant] is back." Carla did not appear at all, and her counsel offered no explanation for her absence.

Beata Isabella Arruda was the Division's permanency worker between April 2016 and February 2017 following Laura's birth and the initial referral. She testified to the substance abuse evaluations and treatment referrals the Division made for Carla between the births of the two children and her lack of compliance. Arruda also testified about the positive test results on Todd's drug screens in October and December 2016, and the many missed appointments for him to complete his substance abuse evaluation. However, Arruda also confirmed many positive observations regarding Carla's care for Laura and the home the child was then sharing with both defendants.

Although Carla claimed she had been prescribed pain medication for injuries suffered in a car accident, Arruda expressed concern that Carla would not sign a release regarding the records of her pain management physician. As to Todd, Arruda testified that during her involvement, he "behaved appropriately" and did not appear to be under the influence of alcohol or drugs. Defense counsel elicited testimony that demonstrated, at least initially after the first referral, Carla and Todd provided a safe and secure home for Laura.

The Division called Alan as a witness, ostensibly to identify a Ring doorbell video from February 22, 2019, i.e., approximately two weeks after the trial had begun. According to Alan, the video, taken after a supervised visit with the children, showed Carla using a "spoon" or "straw" with a "packet" of an unidentified substance as she stood on the front porch of the home.

During extensive cross-examination, Alan acknowledged that Carla had regularly attended supervised visits with the children in his and Denise's home, and she had vacationed with the children on two occasions. However, in response to questions from Carla's counsel, Alan explained that he and his wife wanted to adopt Laura and Sara and specifically rejected kinship legal guardianship (KLG) as an alternative after discussing that option with the Division. He rejected any suggestion that Carla had put her problems "behind her." When asked if he would be convinced otherwise if Carla addressed her addiction and went to counseling, Alan explained:

> Once she got herself straightened out and a job, full-time job, her own place. I want to see her on her own, established. She's . . . gotten too much help from us over the years, and I screwed up with that. I let her ride too many times, and there's been no improvement. She just gets worse.

In response to further questioning from Carla's counsel, Alan continued:

I've learned over the years, I've seen it, when [Carla] comes over and she's in a great mood, you can get along with her, no confrontation. Then there's another day she comes over and you can't even look at her without her blowing up and, at least from my observation, it's when she's on something you can tolerate her, she's okay. It's when she's off the stuff that you can't get along with her. And as far as getting better, now she's still doing stuff. So as far as getting better at not using stuff, no, she's not getting better with that.

Alan also explained that Carla was not present at trial that day because she had outstanding warrants for her arrest.

Neither defendant was present on April 25, 2019, the third day of trial and the continuation of Arruda's and Kolupanowich's testimony. When trial resumed months later, on August 2, 2019, both defendants were present.

Stephanie Cella, the Division's adoption caseworker, testified about events since June 2019, when she was assigned the case. Cella said that Todd wished to visit with the children, but the Division was attempting to arrange supervision through the YMCA which had a waiting list. Cella also said that Denise and Alan no longer agreed to supervise their daughter's visitation with Laura and Sara. Cella testified both defendants failed to attend updated substance abuse evaluation appointments since the last trial date. When recalled as a witness at a later date, over Carla's hearsay objection, Cella recounted her

11

conversation with Denise and Alan in which they indicated their intention to adopt the girls.[3]

Testimony did not resume again until November 22, 2019, when the Division's expert, psychologist Dr. David Brandwein, testified. Todd did not appear at trial because he was working on a construction site "in [N]orth Jersey." Carla's counsel requested an adjournment because she had entered "a program." Cella was present, and the judge asked if she had advised Carla of the trial date; Cella had, and she confirmed that during her involvement with the case, Carla had never availed herself before of a treatment program. The judge denied the adjournment.

Dr. Brandwein had conducted psychological evaluations of Carla and Todd, and bonding evaluations of each defendant with the children in 2018. During the litigation, the Division had arranged for Dr. Brandwein to prepare updated reports on both defendants. The doctor testified that on two occasions, both Carla and Todd failed to appear for scheduled reevaluation appointments.

---

[3] The Division also later called Heather ZeLapa as a witness, the supervisor of the adoption unit, who described her interactions with Denise and Alan, her explanation to them of the differences between KLG and adoption, and their intention to adopt Laura and Sara.

Dr. Brandwein updated his previous bonding evaluation between the children and Denise and Alan.

The doctor diagnosed Carla with "unspecified opioid-related disorder, generalized anxiety disorder, anti-social and narcissistic personality patterns and perpetrator of domestic violence, non-spouse or partner related."[4]  Dr. Brandwein's diagnosis of Todd was:  "unspecified cannabis-related disorder; an unspecified opioid-related disorder . . . ; a diagnosed generalized anxiety disorder [and] based upon the results of the testing and what [Todd] had told [him] with a rule out for post-traumatic stress disorder."  The doctor opined that it was unlikely either defendant would address their substance abuse in the near future so as to effectively parent the children.  Regarding the bonding evaluations with the children and defendants, Dr. Brandwein concluded that Carla "was consistent and appropriate with the girls during . . . that bonding evaluation period," as was Todd.

Dr. Brandwein continued his testimony on the next trial date, January 30, 2020.  Neither defendant appeared, and neither defense counsel could explain their absences.  With respect to the bonding evaluations he conducted with the

---

[4] The domestic violence diagnosis was premised on the May 25, 2018 incident in which Carla was charged with simple assault on Denise and Alan during a dispute while visiting the children at her parents' home.

A-0245-20

children and Denise and Alan, the doctor opined that Laura "was securely bonded to her grandparents." Sarah, who was less than two-years old at the time, "was developing an initial attachment to her grandparents, [which] . . . was likely to develop into a secure psychological bond when that was appropriate." He noted the defendants had not addressed the serious issues leading to the children's removal, and that Denise and Alan "have been [in] a parental role with [the children] their entire lives." The doctor did not believe that "termination of [defendants'] parental rights would do more harm than good to these children."

Both defendants testified on later trial dates. Carla's testimony commenced on February 18, 2020, and continued August 11, 2020, which is the same day Todd testified. Carla explained that she followed the advice of her pain management physician during her two pregnancies and took prescribed medication for pain caused by a prior motor vehicle accident. She said she was "blissfully unaware that [she] was addicted." Carla claimed that she had not used any drugs since July or August 2019 and was working for a general construction company since June of that year. Carla was living with close family friends. She described the regular visits she had with the children at her parents' home since fall 2019, and expressed willingness to participate in any "treatment" or mental health counseling ordered by the court.

14

Todd was living with his mother and working in construction. He had served time in Iraq while in the Army and hoped to be reunited with Carla and the girls in a home he might finance with a Veterans' Administration loan. He believed that the Division's involvement, and Denise's antagonism toward him, were responsible for the family's disintegration. Todd acknowledged taking prescription medications and occasionally using marijuana, but he denied that the Division ever referred him to a substance abuse program.

On the last hearing date, August 13, 2020, the judge ruled on various documents the DAG sought to introduce into evidence, concluding several contained inadmissible hearsay and excluding the reports. The attorneys gave their closing arguments. The judge rendered his oral decision on the record on September 3, 2020; we discuss that in detail below. He entered a conforming judgment of guardianship the same day.

## II.

To terminate parental rights, the Division must prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a) (2015); see also In re Guardianship of K.H.O., 161 N.J. 337, 347–48 (1999).][5]

"The focus of a termination-of-parental-rights hearing is the best interests of the child." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Fam. Servs. v. R.D., 207 N.J. 88, 110 (2011)). The four statutory prongs "are neither discrete nor separate. They overlap to provide

---

[5] The Legislature recently enacted L. 2021 c. 154 (eff. July 2, 2021), amending N.J.S.A. 30:4C-15.1(a)(2) to exclude from consideration the harm to children caused by removal from their resource parents. Accordingly, the second sentence of prong two has been eliminated. Although the briefs in this matter were filed before the amendment, defendants have not argued the revised statute applies retroactively. See R. 2:6-11(d); see also James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing generally statutes should be applied prospectively).

a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

The guideposts for our review are well known. We must uphold the trial court's findings if "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We defer to the judge's factual findings because he had "the opportunity to make first-hand credibility judgments about the witnesses . . . [and] ha[d] a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293). We accord even greater deference to the Family Part's factual findings because of its "special jurisdiction and expertise in family matters." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

A.

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. 365, 383 (1999)).

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). This prong may be proven by "indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, [and] the inability to provide a stable and protective home." K.H.O., 161 N.J. at 353. "Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (second alteration in original) (quoting K.H.O., 161 N.J. at 363). Prongs one and two "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

As to prong one, Carla argues the Division "offered no proof . . . how [her] substance abuse harmed her children."  She cites caselaw in support of the proposition that a parent's use of illegal drugs during pregnancy is insufficient proof of harm, as is the mere fact that the child tested positive for illegal drugs at birth.  See, e.g., A.L., 213 N.J. at 23–25.  As to the second prong, Carla contends hers "is not a case where a parent refused to comply with demanded services[,]" but rather the Division simply "failed to follow through with appropriate referrals for housing and appropriate substance abuse treatment." We disagree.[6]

The judge reviewed Carla's stay at the hospital immediately following Laura's birth in February 2016.  He noted Carla's continued positive drug screens following the birth, as well as her evasive answers and obfuscations whenever the Division attempted to ascertain whether defendant's claimed continued use of prescription drugs to alleviate pain was legitimate.  The judge took note that in 2017, "things seemed to be stabilizing[,] if not getting better" for Carla.

---

[6] In a separate point, Carla contends the judge "erroneously applied the best interest standard" as to all four prongs instead of the statutory "clear and convincing evidence standard."  The argument lacks sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  The judge clearly understood what the Division's burden of proof was and said so.  Additionally, the statute itself states the Division must prove that termination of parental rights is "in the best interest of the child," N.J.S.A. 30:4C-15.1(a).

However, there was evidence of Carla's continued drug addiction during her second pregnancy and her admission that "she needed help." At birth, Sara tested positive for opiates, and there were concerns that she might suffer withdrawal symptoms.

In concluding the Division had satisfied its burden under prong one, the judge found that "in each of the hospitalizations just before the birth of the child[, Carla] was willing to make the decision that the drug abuse was more important than the risk that the child would suffer particularly from withdrawal symptoms. That risk continues as long as there is continued use." See N.J. Div. of Youth & Fam. Servs. v. L.M., 430 N.J. Super. 428, 444 (App. Div. 2013) (holding that ongoing irresponsible behavior by a drug-addicted parent, and his or her failure to take advantage of services offered by the Division, can meet the burden of proof).

Moreover, the judge found that Carla and Todd were "satisfied to be happy visitors" in the children's lives, resulting in Denise and Alan "tak[ing] on the strain and responsibilities" of parenting "while [defendants] continued to enjoy their unaddressed drug lifestyle." Lastly, the judge found that both defendants "were absent due to their own incarceration." These findings and conclusions are supported by the record evidence.

As to prong two, the judge recognized "there [were] some occasional yet very brief periods where [defendants] appeared to want to engage in treatment," but "thereafter they resorted to covering up or preventing detection in any way by the [c]ourt and by the Division." This finding, particularly as to Carla, is clearly and convincingly demonstrated by the record evidence which the judge specifically detailed.

Carla's argument that the Division's substance abuse referrals were not appropriate lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E). It suffices to say, Carla was in no position to choose what program she wished to attend and refuse to go to others. Indeed, the judge cited repeated examples, even while the litigation was pending, in which Carla simply failed to attend evaluations so the process could move forward. More importantly for our purposes, regarding both defendants, the judge specifically found:

> they believed that they could manipulate the course of events, sometimes through lies, sometimes by avoidance, and . . . they believe[,] and continue to believe[,] that they need to only come up with a story or an excuse and people would likely believe them. The [c]ourt cannot credit their testimony.

Additionally, the judge did not cite Dr. Brandwein's testimony in reaching his conclusions on these prongs, rather, he extensively referred to the doctor's findings and opinions in his decision. Dr. Brandwein opined that Carla lacked

21

any insight into her substance abuse problems and demonstrated an "unwillingness to acknowledge problems that were clear and evident."

The Division's evidence regarding prongs one and two as to Carla was clear and convincing, and we find no reason to disturb the judge's findings and conclusions.

B.

N.J.S.A. 30:4C-15.1(a)(3) requires the Division make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights." A court's inquiry into the reasonableness of the Division's efforts also includes a consideration of "whether a parent actively participated in the reunification effort." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (citing D.M.H., 161 N.J. at 393). Moreover, "[e]xperience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship," F.M., 211 N.J. at 452, and even if the Division provides deficient services to a parent, reversal is not necessarily warranted, "because the best interests of the child controls" the ultimate determination, N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007).

Carla contends the Division failed to make "reasonable efforts" because it "failed to provide services that were reasonable under all the circumstances." Additionally, she argues the judge failed to "explore alternatives to termination." Todd contends the judge's consideration of alternatives to termination was flawed because it relied upon hearsay statements by Denise, who never testified, but allegedly made to the Division's workers about her desire to adopt Laura and Sara. We are unpersuaded by any of these arguments.

The judge found it was "difficult to think of a more determined effort by the Division and its contracted substance abuse counselors to help the parents address drug issues." He cited the evidence demonstrating the "scores" of unsuccessful appointments the Division made for defendants, yet, it "tried and tried again" to offer substance abuse treatment to them. The judge cited problems the Division had in maintaining contact with both defendants and arranging visitation when Denise and Alan refused to supervise the visits. He found the various Division workers' testimony "was remarkably consistent" about their efforts to provide treatment, "only to be rejected over a period of time." All these findings and conclusions are supported by the evidence.

The judge specifically considered alternatives to termination. He rejected defendants' contention that Alan was confused about his and Denise's

23

commitment to adopt Laura and Sara, specifically finding from the testimony "[t]here was never a question in [Alan's] mind as to what he wanted." The judge found the grandparents rejected KLG, and he cited Alan's skepticism about Carla's ability to address her addiction, and both defendants' "constant disruption in [the grandparents' lives] and . . . the lives of the girls." The judge concluded Denise and Alan "made their decision [to adopt] . . . unconditionally, unambiguously, and unqualifiably."

Seen in this light, Todd's contention that testimony about Denise's statements to the Division's workers were inadmissible hearsay provides no basis to reverse. Even if the statements should have been excluded, any error was harmless in light of Alan's unequivocal testimony about the couple's commitment to adopt during defense counsel's questioning. R. 2:10-2. The judge found that testimony credible.

## C.

The fourth prong of the statute requires the court to determine that termination "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (quoting G.L., 191 N.J. at 609). "The question ultimately is not whether a biological mother or father is a

worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. Typically, "the [Division] should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).

The judge's findings for prong four credited Dr. Brandwein's expert testimony that Laura was firmly bonded to her grandparents, and Sara, who had lived with them her entire life, was firmly attached to them. The doctor acknowledged that Sara was too young to have already formed a psychological bond with Denise and Alan, but it was probable she would eventually do so under the circumstances. The judge noted the doctor testified that the children's relationship with defendants "was friendly and comfortable, but it was not parental." He credited the doctor's testimony that "the children would not suffer enduring psychological harm if the parents' rights were terminated or that any harm that might result, . . . the grandparents would be able to mitigate."

Carla claims the Division's proofs were insufficient because the "evidence showed . . . [she] was clearly committed to her daughters and complied with services." She also contends the evidence was inadequate because the Division

25

failed "to provide an updated bonding evaluation." Todd argues that the judge misapplied the statutory standard and, even if the proper standard was applied, the evidence was insufficient to prove that termination would not do more harm than good.

An updated bonding evaluation was not performed because both defendants, on two separate occasions, failed to appear for a scheduled appointment. That testimony, from Dr. Brandwein, was unrefuted. Carla seizes on the doctor's candid admission that she demonstrated a caring and appropriate attitude during the bonding session and transforms that into an argument that she "complied with services"; she clearly did not. Moreover, no one questions that Carla loves her daughters and is committed to their well-being. However, under the fourth prong, the court must engage in an exquisitely difficult balancing process to determine whether termination will do more harm than good. The judge gave careful consideration to the evidence, particularly Dr. Brandwein's conclusion that the children would not suffer significant, enduring harm if Carla's parental rights were terminated. We see no basis to reverse.

Todd seizes on statements the judge made using the term "likely" or "unlikely" in recounting some of the evidence. From this, he contends the judge applied a "preponderance of the evidence" standard instead of requiring clear

and convincing proof. The argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Todd also argues that Dr. Brandwein failed to opine that Sara had a firm, secure bond with Denise and Alan, and he claims that the doctor's testimony did no more than express an opinion that the girls' life with their grandparents was "better" than it was with Todd and Carla. He notes that the Court has specifically rejected the premise that the statutory best interests standard can be met when the Division only proves when the resource home is simply better than the parents' home. See, e.g., N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 602–03 (1986) ("Our statute speaks of the 'best interests' of the child. We emphasize at the outset that the 'best interests' of a child can never mean the better interests of the child." (citing In re Guardianship of Cope, 106 N.J. Super. 336, 340–41 (App. Div. 1969))).

However, a fair reading of both Dr. Brandwein's testimony and the judge's findings make clear that the prong four evidence was taken in the context of all the evidence regarding the other statutory prongs. The findings were not a comparison between defendants' home and the grandparents' home. They reflected earlier findings that it was unlikely defendants could ameliorate the harm caused by their drug usage and unstable lifestyles to provide Laura and

27

Sara with the permanency they needed. In evaluating the fourth-prong proofs, "an important consideration is '[a] child's need for permanency.'" F.M., 211 N.J. at 453 (alteration in original) (quoting M.M., 189 N.J. at 281). "Keeping the child[ren] in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citing In re P.S., 315 N.J. Super. 91, 121 (App. Div. 1998)).

III.

Carla and Todd both contend that the judge relied upon inadmissible hearsay evidence in reaching his conclusions. Todd contends that the judge's early ruling regarding the bulk of the Division's documentary evidence effectively "muzzled" counsel and rendered his assistance ineffective. Carla joins in the argument, contending it is unclear whether the judge relied on embedded hearsay statements in the documents because he failed to rule on her objections or force the Division to redact hearsay from the records.

The Division and the Law Guardian both argue that the judge made clear he would examine the records, exclude inadmissible hearsay, and not rely on it in his decision. Both contend that it is clear from the judge's opinion he did not rely on inadmissible hearsay contained in the Division's records.

28

We agree that the method employed by the judge at the start of the case was problematic. Carla's counsel lodged specific objections to sections of numerous Division documents, but the judge chose not to rule on them at that point. Having examined the documents ourselves, we have little doubt that some of them contained inadmissible hearsay. A better practice would have been for counsel to have reviewed all the documents before trial and present to the judge only those upon which they could not agree should be redacted for his decision.

However, as the judge noted, guardianship trials are bench trials, and, in all bench trials, the judge has access to, and must review, evidence that ultimately is not admitted. We trust the judge to accept and consider only admissible evidence, even when a document is admitted into evidence subject to objections and not redacted beforehand, as was the case here.

Moreover, our review of the transcript reveals that defense counsel continued to object throughout the trial to testimony and documentary exhibits because of hearsay or on other grounds, and the judge was actively involved in making rulings on those objections. He frequently sustained the objections. In short, we have no doubt the judge understood the Rules of Evidence and properly considered only admissible evidence contained in the Division's documents in making his findings and reaching his conclusions. Nothing in the judge's

29

decision itself is premised on inadmissible evidence or otherwise unsupported by properly admitted evidence. We find no reason to reverse on these grounds.

Lastly, in a separate point, Carla contends the judge was biased toward her and her counsel so as to deny her a fair trial. The argument lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E). The judge was anxious to complete the testimony, which was interrupted at several points and, for several months by the Covid-19 closing of the courts. Nonetheless, defendants were given a full and fair opportunity to contest the Division's proofs and to testify at length in their defense.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0245-20