**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0980-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.M.F.,[1]

      Defendant-Appellant,

and

A.H.G.,

      Defendant,

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
A'N.E.G. and A'Y.H.G., minors.

_____

Argued September 29, 2022 – Decided October 14, 2022

---

[1] We utilize the parties' initials and pseudonyms to assure confidentiality pursuant to Rule 1:38-3(d)(12).

Before Judges Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0011-21.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Meaghan Goulding, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Meaghan Goulding, on the brief).

Cory H. Cassar, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, of counsel; Cory H. Cassar, of counsel and on the brief).

PER CURIAM

Defendant T.M.F. (Teresa) appeals from a November 10, 2021 Family Part order terminating her parental rights to A'N.E.G. (Annie), born in October 2016, and A'Y.H.G. (Alan), born in September 2017. Teresa is the biological mother of Annie and Alan.[2] Defendant A.H.G. (Adam), the children's father, does not appeal the termination of his parental rights. Teresa argues that the Division of Child Protection and Permanency (Division) failed to establish by

---

[2] Teresa's third child, O.F., was born in June 2019 and is not part of this appeal.

clear and convincing evidence each prong of the statutory best interests test under N.J.S.A. 30:4C-15.1(a). The Law Guardian seeks affirmance. We disagree with Teresa's arguments and affirm substantially for the reasons given by Judge David B. Katz in his comprehensive seventy-four-page written opinion.

I.

We begin our discussion with the legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when parental rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;[3]

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

---

[3] We are aware that on July 2, 2021, the Legislature enacted L. 2021 c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which reads "[s]uch harm may include evidence that separating the child from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child."

## II.

We first address Teresa's argument that the judge erred in finding the Division proved by clear and convincing evidence each of the four prongs of the best interests test. The Division became involved with Teresa as a minor due to her own mother's abuse and neglect, and her mother's parental rights were terminated when Teresa was eight years old. Teresa was adopted by a family friend, but was emotionally abused by her adoptive mother and sexually abused in the adoptive home.

In November 2016, the Division became involved with Teresa as a parent shortly after Annie was born due to allegations of drug abuse, unstable and unsafe housing, and child neglect. At the time, Teresa resided with her biological mother and other tenants in a foreclosed home. Drugs were being sold in front of the house. The Division did not find Teresa abused or neglected Annie, but assisted her with a substance abuse evaluation and treatment, in-home parenting skills, and a psychological evaluation. Teresa was diagnosed with a cannabis use disorder. Substance abuse treatment was recommended, but Teresa declined treatment.

In February 2017, a Division caseworker determined Teresa's home lacked heat and hot water. Teresa signed a safety protection plan and moved

5

with Annie to the home of her paternal grandmother, T.C. The Division also referred Teresa to the Essex County Pregnancy and Parenting Connection program for housing assistance and job skills training. In March 2017, another Division caseworker visited Teresa's home and ascertained Annie did not have Medicaid coverage, and Teresa was not receiving food stamps or cash benefits.

In May 2017, the court granted the Division's request for care and supervision of Annie. Due to Teresa's lack of cooperation in attending psychological evaluations and obtaining medical insurance coverage for Annie, the court granted the Division's application for custody, care, and supervision of Annie in August 2017.

Alan was born prematurely a month later. Due to ongoing concerns about Teresa's inadequate housing and failure to comply with services, the Division was granted custody of Alan upon his release from the hospital, and he was placed with Annie in T.C.'s home. On January 25, 2018, the children were removed from T.C.'s home after the Division became aware of her spouse's criminal history, thereby rendering her home ineligible for a resource home license under N.J.S.A. 30:4C-26.8(e). The children were placed in an unrelated resource home with C.S. The Division continued to offer services to Teresa,

6

such as Greater Essex Counseling, but she failed to attend. Teresa also failed to attend psychological evaluations scheduled by the Division.

On April 26, 2018, Teresa did attend a psychological evaluation with Dr. Denise Williams Johnson. Dr. Williams Johnson recommended a medical evaluation, therapy, and supervised visitation. Between April and July 2018, Teresa only attended seventeen out of twenty-nine meetings with the children at Family Intervention Services' (FIS) Enhanced Supervised Visitation and was terminated from the program.

On July 31, 2018, a permanency hearing was held. Teresa was granted a three-month extension to work towards reunification with her children. However, her visits remained inconsistent. The Division provided Teresa with employment services, housing information, and Salvation Army shelter information, which she declined. Consequently, on October 30, 2018, the court approved the Division's plan to terminate Teresa's parental rights.

On January 28, 2019, Dr. Elizabeth Stilwell conducted a psychological and bonding evaluation of Teresa. Dr. Stilwell opined that Annie and Alan had a positive attachment to their mother and recommended the Division continue reunification efforts, such as offering defendant a Mommy and Me program. When Teresa informed the Division in February 2019 that she was five or six

months pregnant and was not receiving prenatal care, she was denied admission into the program.

On February 26, 2019, Teresa underwent a psychiatric evaluation with Dr. Samiris Sostre, who recommended she take a mood stabilizing agent and antidepressant medication. Dr. Sostre also noted Teresa would benefit from trauma-focused therapy. The Division arranged for Teresa to receive the treatment recommended by Dr. Sostre at Family Services Bureau of Newark, but she failed to attend. In early 2019, the Law Guardian retained Dr. Karen D. Wells to conduct a bonding evaluation with C.S. Dr. Wells concluded the children were thriving in the resource home, and she cautioned against removing them from C.S. On April 17, 2019, Teresa was admitted to a Mommy and Me program at Newark Renaissance House (NRH).

On May 29, 2019, the court changed the permanency plan from adoption back to reunification after noting Teresa's stability at NRH. She was granted unsupervised overnight visitation with the children. However, in August 2019, due to Teresa's aggressive behavior towards other residents, she was discharged from NRH the following month and placed by the Division in Eva's Village Mommy and Me program. However, Teresa was discharged in September 2019 after leaving the program with O.F. without informing the staff.

8

On October 21, 2019, Teresa and O.F. were placed in another Mommy and Me program at Isaiah House, where she received advice on housing applications and was provided therapy. About a month later, Teresa began substance abuse treatment at the Bridge and underwent a psychological evaluation at It Takes a Family. On January 6, 2020, Isaiah House reported Teresa's lack of contribution to required activity hours and mentioned her behavioral issues. On February 27, 2020, Teresa was terminated from Isaiah House after her involvement in a fight at the facility.

After Teresa's plan to move to Pennsylvania with O.F. was not approved by the Division, an emergency removal of O.F. was implemented in light of her unstable circumstances. O.F. was placed in the care of C.S., along with Annie and Alan. Dr. Stilwell conducted an updated psychological evaluation and comparative bonding evaluations. In her opinion, Dr. Stilwell concluded Teresa was not a viable parenting option, and Annie and Alan did not view her as their primary attachment figure. Instead, the children were positively attached to C.S. Dr. Stilwell opined Annie and Alan would be "well[-]served by achieving permanency through adoption by the resource parent."

Because of the COVID-19 pandemic, Teresa had virtual visitation with the children in spring 2020. On May 18, 2020, the court held another

9

permanency hearing and approved the Division's plan of termination of Teresa's parental rights followed by adoption. The court noted Teresa's aggressive behavior, ongoing mental health issues, and inability to provide a safe and stable home. Teresa's cousin, J.F., who resides in Pennsylvania, informed the Division she was not interested in the placement of the children under her care. The Division continued to support Teresa as she explored various job and housing opportunities.

In January 2021, Teresa told her therapist at Grace Abounds Counseling that she got into a physical altercation with neighbors and disjointed her knuckle, resulting in hand surgery. Teresa missed scheduled visits with the children and failed to attend the May 5, 2021 court hearing. Consequently, the Division canceled its bonding and psychological evaluations. Rapid Housing approved Teresa's application for subsidized housing for a one-year period, but she failed to provide requested materials and her application was rejected.

On June 24, 2021, Dr. Wells conducted a follow-up evaluation of Teresa. Dr. Wells noted Teresa continued to be transient and thought lack of housing was the only hinderance to her reunification with her children. On June 29, 2021, Dr. Stilwell conducted a psychological evaluation of Teresa and concluded she "does not have a healthy framework for coping with life stressors

10

and engaging in healthy and supportive relationships with others." Dr. Stilwell recommended termination of Teresa's parental rights. Notwithstanding, in July 2021, the Division referred Teresa back to Grace Abounds for counseling.

In October and November 2021, Judge Katz held a six-day trial over non-sequential days. Teresa did not appear for trial. Division caseworkers Helena Roberts, Aneika Carter, and Janell Bullock, as well as Dr. Stilwell, testified on behalf of the Division. Dr. Wells testified on behalf of the Law Guardian. Teresa's attorney called Nichola Johnson, a counselor from Grace Abounds, to testify on her behalf. Johnson was Teresa's second counselor at Grace Abounds and acknowledged that she never met Teresa for in-person sessions, did not know much about her history, and largely relied on Teresa's self-reporting in formulating her opinions.

## III.

Judge Katz concluded—relying on the credible evidence the Division and Law Guardian provided—that it was in Annie's and Alan's best interests to terminate Teresa's parental rights. Regarding prong one, Teresa contends the Division failed to meet its evidentiary burden. Teresa avers she never harmed her children. Instead, she claims many of her challenges are rooted in "poverty," which should not serve as the basis for termination of her parental rights.

11

Additionally, Teresa argues the Division did not prove a causal link between her situation and any harm that the children suffered as a result, and the judge ignored evidence the resource parent has caused the children's behavioral issues and maintained an unsafe environment for them. We disagree.

## A.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The concern is not only with actual harm to the child but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 616 n.14 (1986)). The focus is not on a single or isolated event, but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. However, a judge does not need to wait "until a child is actually irreparably impaired by parental inattention or neglect" to find child endangerment. D.M.H., 161 N.J. at 383 (citing A.W., 103 N.J. at 616 n.14).

The Court has explained a parent's withdrawal of nurture and care for an extended period is a harm that endangers the health of a child. Id. at 379 (citing

K.H.O., 161 N.J. at 352-54). When children "languish in foster care" without a permanent home, their parents' "failure to provide a permanent home" may itself constitute harm. Id. at 383 (second quotation citing N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591-93 (App. Div. 1996)).

Judge Katz emphasized that his conclusion regarding harm to the children was based on years of Teresa's transient lifestyle despite the Division's repeated attempts to assist her. The judge highlighted several instances of Teresa's dereliction under prong one, including her failure to provide safe supervision and stable housing, including lack of heat and hot water in the home. Moreover, the judge found Teresa's recalcitrance in seeking substance abuse treatment and her inability to pursue reinstatement of health insurance for Annie further evidenced continued harm to the children.

Additionally, the judge based his findings on the uncontroverted expert testimony proffered by Drs. Stilwell and Wells. Dr. Stilwell opined that consistent mental health treatment may have helped Teresa be a better parent. In her assessment, Dr. Stilwell drew a causal link between Teresa's conduct and its consequences to the behavioral challenges exhibited by the children, including her inconsistent visitation, amounting to harm and lack of permanency. According to Dr. Stilwell, because the children struggled between

possible reunification with Teresa and permanency with the resource parent, they are "at an increased risk for emotional and behavioral disturbances." As Dr. Stilwell explained, delays in permanency heightens the children's awareness of their unstable circumstances, which further exacerbates negative behavioral patterns for them.

Teresa also challenges the judge's conclusion that her action or inaction harmed the children. Rather, Teresa attributes her helplessness and struggles to poverty, and argues termination should not be based on her "economic or social circumstances," as she contends finances and housing are the only factors prohibiting reunification.

However, the record clearly demonstrates the Division provided repeated assistance to Teresa and directed her to several resources over a five-year period. The court need not wait until children are "irreparably impaired" by parental abuse or neglect. D.M.H., 161 N.J. at 383. "The State has a parens patriae responsibility to protect children from the probability of serious physical, emotional, or psychological harm resulting from the action or inaction of their parents." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 110 (App. Div. 2004). There is no basis for us to disturb the judge's finding that the Division satisfied prong one as against Teresa by clear and convincing evidence.

14

B.

The second prong of the best interests determination "in many ways, addresses considerations touched on in prong one." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012). Evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379 (citing K.H.O., 161 N.J. at 348-49). This prong "relates to parental unfitness," K.H.O., 161 N.J. at 352, and "the inquiry centers on whether the parent is able to remove the danger facing the child," F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352).

The Division can satisfy this inquiry by showing the parent or parents cannot provide a safe and stable home and that the child or children will suffer substantially from a lack of stability and permanent placement. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (quoting K.H.O., 161 N.J. at 363). Because the Legislature placed "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child[ren][,] [t]he emphasis has shifted from protracted efforts for reunification with [the] birth parent[s] to an expeditious, permanent placement to promote the child[rens']

A-0980-21

well-being." C.S., 367 N.J. Super. at 111; D.M.H., 161 N.J. at 385; K.H.O., 161 N.J. at 357-58.

Teresa asserts the judge did not identify the services she failed to attend. She claims to have willingly complied with required services and that she had regular visitation with her children. We reject Teresa's argument. The judge determined the experts were "credible" and pointed out his multiple concerns regarding Teresa's inability to mitigate the harm and stressors facing her children. For example, Teresa has experienced difficulties completing the parenting program, displayed inconsistencies with attending counseling services and visitation with her children, and struggled with home security in multiple programs due to physical altercations with others residing in the facilities. She also failed to follow up with psychological evaluation referrals despite a myriad of longstanding mental health diagnoses, such as bipolar and borderline personality disorders.

As we have stated, "[k]eeping the child in limbo, hoping for some long[-] term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citing In re P.S., 315 N.J. Super. 91, 121 (App. Div. 1998)). Here, the judge discounted Johnson's characterization of Teresa, who testified she "appeared to be a good

16

parent," who was open and invested in services, and consistent with counseling attendance. Based on the substantial credible evidence, the judge found Teresa lacks the capacity to take care of Annie and Alan. Indeed, the evidence denotes Teresa canceled or skipped half of the scheduled visitation sessions, and she was terminated from several programs—FIS, Care Plus, and Family Connections—due to poor attendance. The record supports the judge's conclusion as to prong two.

C.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks omitted).

Teresa argues the Division failed to show by clear and convincing evidence that it provided housing assistance for her. She also asserts financial

17

resources should have been routed to her instead of the resource parent; and had this been done, she may have been able to secure stable housing. Again, we disagree.

"[A]n evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis." D.M.H., 161 N.J. at 390. The evaluating court must also consider "the parent's active participation in the reunification effort." Ibid. In any situation, "[t]he services provided to meet the child's need for permanency and the parent's right to reunification must be 'coordinated' and must have a 'realistic potential' to succeed." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).

This requires the Division to "encourage, foster and maintain the parent-child bond, promote and assist in visitation, inform the parent of the child's progress in foster care and inform the parent of the appropriate measures [they] should pursue . . . to . . . strengthen their relationship." R.G., 217 N.J. at 557 (alterations in original) (internal quotation marks omitted) (quoting D.M.H., 161 N.J. at 390). What constitutes reasonable efforts varies with the circumstances of each case. D.M.H., 161 N.J. at 390-91. However, the Division is not required

to be successful in its efforts to provide services, id. at 393, or to provide services at all when it is not in the children's best interests, see L.J.D., 428 N.J. Super. at 488.

In the matter under review, the judge credited the Division's efforts over a five-year period to provide Teresa with services and referrals for substance abuse assessment and treatment, parenting classes, psychological and psychiatric evaluations and treatment, trauma therapy, medication management, therapeutic visitation, and three Mommy and Me programs. Moreover, the Division offered substance abuse services to Teresa and her biological mother in an effort to maintain Teresa in her initial housing. But Teresa's biological mother was non-compliant, leading the Division to approve Teresa and Annie living with the child's paternal grandmother. However, Teresa was discovered living back at her biological mother's house. We have no reason to second guess those or any other findings.

Moreover, some of the difficulties Teresa faced could have been resolved through obtaining basic identification documents, which are required to access and obtain social services. The Division paid for and provided Teresa with her birth certificate on two different occasions and replaced the original documents she lost. The Division also offered to pay for the security deposit on an

19

apartment if Teresa was able to show proof of her income. One of the caseworkers assisted Teresa with a referral to Legal Services, who made phone calls to the Social Security Administration with Teresa and advised her on requirements to obtain assistance.

Dr. Wells opined Teresa's inability to secure and maintain documentation necessary for housing and employment "reflects the level of psychological instability and emotional immaturity that she has." Further, Dr. Wells observed Teresa's pattern of taking "no responsibility" for her failure to comply with services and visit the children was the result of her lack of insight "that the commonality here is [her]." We are satisfied the Division established prong three by clear and convincing evidence.

### D.

The fourth prong of N.J.S.A. 30:4C-15.1(a)(4) serves as "a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453 (citing N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007)).

> [T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of

> ties with [their] natural parents than from the permanent disruption of [their] relationship with [their] foster parents.
>
> [K.H.O., 161 N.J. at 355.]

"The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013) (citing C.S., 367 N.J. Super. at 119). "If one thing is clear, it is that the child deeply needs association with a nurturing adult. Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life." A.W., 103 N.J. at 610. Therefore, "to satisfy the fourth prong, the State should offer testimony of a 'well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (quoting J.C., 129 N.J. at 19).

"It has been 'suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future.'" N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008) (alterations in original) (quoting A.W., 103 N.J. at 610). "[C]ourts have recognized that

21

terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." Id. at 109 (citing A.W., 103 N.J. at 610-11).

Teresa challenges the judge's prong four findings arguing termination of her parental rights will do more harm than good. She contends the resource home is a "foster house of horrors" and that the resource parent is overwhelmed with caring for the children. And, Teresa questions C.S.'s ability and commitment to provide a permanent home for the children through adoption. Having thoroughly reviewed the record under our standard of review and the applicable law, we conclude Teresa's arguments as to prong four lack merit.

The judge weighed the expert testimony presented by the Division and the Law Guardian. Dr. Stilwell testified about the children's need for permanency and stability, and stated, "we can't focus on higher level things, such as, in a child's case, school or friendships, developmental tasks. When a child doesn't have stability, that developmental trajectory gets disrupted or delayed." Dr. Wells opined it would be "extremely difficult" for Teresa to consistently take care of the children and that she "is not a viable parenting option" for the children "now or in the foreseeable future."

Teresa also claims the children developed "psychiatric conditions" because they were permitted to stay awake until midnight. But the judge

22

considered and gave weight to both Dr. Stilwell's and Dr. Wells's testimony that the children's emotional and behavioral disturbances are due to their permanency being in flux. In fact, Dr. Wells opined that Alan's behavioral challenges span various environments and are likely attributable to his premature birth and resulting developmental delays.

We are also unpersuaded by Teresa's contention that C.S.'s decision to obtain counseling for herself evidences she is ill-equipped to parent the children. Dr. Stilwell testified C.S. "is attuned to the children's needs" and has demonstrated she will access services where the children's needs exceed her skills. Moreover, Dr. Stilwell testified that C.S. and the children have "a very strong relationship" and C.S. is "very committed to caring for the kids." In addition, Dr. Stilwell testified C.S. "[r]eally goes above and beyond to ensure that the children's needs are met, seeks out doctors and specialists to try to help with their behavioral disruptions, [and] enrolls them in [extra]curricular activities to engage their interests."

Dr. Wells testified that C.S. has reaffirmed her commitment to adopting the children and has "integrated them fully into her life." Further, we reject Teresa's argument that the record did not include any competent evidence establishing C.S. wanted to adopt the children. The Division presented reports

23

stating C.S. informed the Division caseworkers she wanted to adopt without objection to the introduction the reports at the hearing. The judge found Bullock's testimony credible that the Division's plan for the children was adoption by C.S., who was educated by the Division about the differences between Kinship Legal Guardianship and adoption. And, C.S. expressed her intent to both Drs. Stilwell and Wells that she wanted to adopt the children.

The judge duly found a real parental relationship exists between the children and C.S., who is committed to adopting them. The record supports that finding under prong four.

IV.

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." F.M., 211 N.J. at 448-49 (citing E.P., 196 N.J. at 104). "We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." Id. at 427.

A-0980-21

Although our scope of review is expanded when the focus is on "'the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,' . . . . even in those circumstances we will accord deference unless the trial court's findings 'went so wide of the mark that a mistake must have been made.'" M.M., 189 N.J. at 279 (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). We are satisfied the Division has proven all four prongs of the best interests standard under both the old and amended version of N.J.S.A. 30:4C-15.1(a).

To the extent we have not addressed any other argument, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0980-21